**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOSEPH KERRISSEY, III,**　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　**Plaintiff,**　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　　　) | **Civil Action No.** |
| 　　　　**v.**　　　　　　　　　　　　　　　　) | **21-11277-FDS** |
| 　　　　　　　　　　　　　　　　　　　　　　) | |
| **WILLIAM BRUCE, et al.,**　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　**Defendants.**　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　　　) | |

**MEMORANDUM AND ORDER ON DEFENDANT WILLIAM BRUCE'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S**
**MOTION TO STRIKE, FOR SANCTIONS, AND FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This case arises out of a dispute between two former business partners, plaintiff Joseph Kerrissey, III and defendant William Bruce. Kerrissey and Bruce worked together on two different real-estate development projects. However, their working relationship deteriorated and Bruce organized an involuntary bankruptcy against Kerrissey and his company, J. Kerrissey, LLC. Kerrissey was initially represented by counsel in this action but is now proceeding *pro se*.

Bruce has moved for partial summary judgment as to the claims for abuse of process, fraud, intentional infliction of emotional distress, breach of the implied covenant of good faith and fair dealing, conversion, trespass to property, interference with contracts, accounting, indemnification, and specific enforcement for the grant of real property. Kerrissey has moved to strike certain exhibits filed by Bruce; for sanctions under Fed. R. Civ. P. 11; and for summary judgment in his favor. For the following reasons, defendant's motion will be granted in part and denied in part and plaintiff's motion will be denied.

I.      **Background**

    A.      **Factual Background**

The following facts are undisputed unless otherwise noted.

Joseph Kerrissey, III owned several construction companies.  As relevant here, he was the manager and owner of J. Kerrissey, LLC ("JKLLC").  JKLLC operated as a site-work contractor, clearing, paving, landscaping, installing underground utilities, and otherwise preparing land for development.  (Notice of Removal Ex. 8 ["Am. Compl."] ¶ 7, Dkt. No. 1-10; Pl.'s Mot. Summ. J. Ex. B, Dkt. No. 96-2).  It used construction equipment owned by JDHE Holding, LLC, another company managed by Kerrissey.  (Am. Compl. ¶ 7).

William Bruce worked with Kerrissey on at least two different real-estate development projects:  Blueberry Hill in Melrose, Massachusetts, and Sagamore Place in Lynnfield, Massachusetts.

The Blueberry Hill project was a proposed 19-unit townhouse development on Blueberry Hill Lane in Melrose.  (Pl.'s Mot. Summ. J. Ex. C).  On June 6, 2016, JKLLC submitted a bid to Bruce for site work on the Blueberry Hill project.  (*Id.* Ex. B).  Kerrissey and Bruce then negotiated with a lender to fund the project.  (*Id.* Ex. C).  The lender agreed to a loan of approximately $5 million to a single-purpose LLC owned and controlled by Bruce with more than $2 million allocated for site work.  (*Id.*).  As part of that deal, Kerrissey agreed to defer payment for the final $850,000 of site work performed.  (*Id.*; *id.* Ex. D).  That payment would be held as debt subordinated to the lender's senior debt.  (*Id.* Ex. C).

To that purpose, in January 2017, Forest Street Realty, LLC was organized as a Massachusetts limited liability company with Kerrissey as manager and Bruce as the sole member.  (*Id.* Ex. E).  In March, Forest Street Realty and JKLLC entered into a formal site-work contract for the Blueberry Hill project.  (*Id.* Ex. F; Def.'s Opp'n Ex. A, Dkt. No. 105).  The

parties have submitted different versions of the site-work contract and its addendum.  (*Compare* Pl.'s Mot. Summ. J. Exs. F, G, *with* Def.'s Opp'n Ex. A).  Around the same time, Forest Street Realty executed a $850,000 promissory note to JKLLC "[in consideration] for the deferment of payment for certain labor and materials provided pursuant to" the site-work contract.  (Pl.'s Mot. Summ. J. Ex. I).  That note was secured by a subordinated mortgage on the Blueberry Hill property.  (*Id.* Ex. J).  To close the deal with the lender, Forest Street Realty LLC took out an additional $300,000 mortgage on the Blueberry Hill property.  (Def.'s Suppl. Exs., at 17, Dkt. No 106).  Kerrissey alleges that he personally guaranteed that third mortgage, although such a guaranty is not in evidence.  (Am. Compl. ¶ 13).

Forest Street Realty and JKLLC also executed an "Addendum A" to the site-work contract.  (Pl.'s Mot. Summ. J. Ex. G; Def.'s Opp'n Ex. A).  Addendum A memorialized some agreements that Kerrissey and Bruce had made concerning the project that were not related to site work.  (Pl.'s Mot. Summ. J. Ex. H).  According to Kerrissey, he had lent Bruce money for the Blueberry Hill closing.  (*Id.* at 38).  Bruce had agreed to give JKLLC 12% and Kerrissey 13% of the profits from the project.  (*Id.*).  Kerrissey's version of Addendum A reflects that profit allocation "[i]n consideration for Site Contractor's agreement to defer payment of the Deferred Amount, and Joseph B Kerrissey III agreement to act as Manager for forest [sic] Street Realty LLC."  (Def.'s Opp'n Ex. A).  Bruce's version, however, does not allocate any profits to Kerrissey or JKLLC.  (Pl.'s Mot. Summ. J. Ex. G).

In addition, Kerrissey contends that Bruce agreed to put $100,000 in escrow to pay JKLLC for work on the Blueberry Hill project.  (Am. Compl. ¶ 11; Pl.'s Mot. Summ. J. Ex. OOB).  Bruce also promised to give him some ownership interest in buildable land on a property in Bellingham, Massachusetts.  (Am. Compl. ¶ 11; Pl.'s Mot. Summ. J. Exs. OOA, OOB).  It

3

appears undisputed that Bruce never placed $100,000 in escrow for JKLLC, and that Kerrissey never received any ownership interest in the Bellingham property.

As the Blueberry Hills project got underway, Kerrissey and Bruce started a new venture together: a five-unit residential subdivision in Lynnfield called Sagamore Place. This time, Kerrissey and Bruce agreed to split ownership and profits equally. (Pl.'s Mot. Summ. J. Ex. P). To develop Sagamore Place, they formed Sagamore Place, LLC, in which they held equal ownership interests. (*Id.*). Sagamore Place Realty Trust held title to the land, and Sagamore Place LLC was the beneficiary of the trust. (Def.'s Opp'n Ex. E, at 36).

On January 17, 2018, Bruce, both individually and as trustee of Sagamore Place Realty Trust, borrowed more than $2 million to fund the acquisition and development of Sagamore Place. (Pl.'s Mot. Summ. J. Ex. Q). Both Bruce and Kerrissey personally guaranteed that loan. (*Id.*).

Before the Sagamore Project closed, on November 21, 2017, Kerrissey texted Bruce that he had made a deal with company called Carger Trust and that he "need[ed] [Bruce] to pay back the money [he] ha[d] borrowed" so that Kerrissey could "immediately" make a $15,000 payment to that company. (*Id.* Ex. QQ). The next week, Bruce promised to send the $15,000 directly to Carger Trust as repayment for certain money he owed Kerrissey. (*Id.*). Two days later, after more prompting from Kerrissey, Bruce texted that he had sent a check to Carger Trust. (*Id.*). It appears undisputed that Bruce never sent the check.

Kerrissey and Bruce's working relationship fell apart in the following months. Kerrissey contends that he performed substantial work on the projects without payment, and that his ownership interest in the projects did not reflect his disproportionate financial contributions. (*Id.*. Ex. W). He maintains that Bruce stopped paying JKLLC for work on the Blueberry Hills

4

project in December 2017.  (*Id.* Ex. M, at 62).  As for Sagamore Place, the lender stopped releasing money for the project in April 2018, as a subcontractor had placed a lien on the property for work the lender contended it had already paid for.  (*Id.* Ex. S).  It appears that Kerrissey stopped work on both projects in May 2018.  (*Id.* Ex. M, at 62; *id.* Ex. N).[1]

On May 31, 2018, Kerrissey's lawyer sent a demand letter to Bruce.  The attorney alleged that Kerrissey had "contributed essentially all the required project cash contributions, in excess of $300,000," and sought a meeting to "right[] the Melrose and Lynnfield relationships."  (*Id.* Ex. O).  The attorney also threatened that "in the absence of such a resolution, a suit seeking both injunctive relief and an accounting will be filed."  (*Id.*).

Around that time, Bruce organized an involuntary-bankruptcy petition against JKLLC and Kerrissey individually.  It is not clear from the record whether Bruce began reaching out to potential involuntary-bankruptcy petitioners before or after the May 31 demand letter.  Nonetheless, it is undisputed that he solicited JKLLC and Kerrissey creditors to join the involuntary bankruptcy and that he paid for attorney Gary Cruickshank to represent those creditors.  (*Id.* Ex. X).  Bruce himself was not a creditor and did not join the petition.  On June 11 and 12, attorney Cruickshank filed an involuntary-bankruptcy petition against both JKLLC and Kerrissey on behalf of the petitioning creditors.  (*Id.* Exs. Y, Z).  The petition against Kerrissey individually was initiated, amongst others, by Carger Trust, with a claim of more than $250,000.  (*Id.* Ex. CC, at 200).[2]

---

[1] Kerrissey disputes the authenticity of the termination letter, but has not disputed that JKLLC was in fact terminated.  (Def.'s Opp'n 3-4, Dkt. No. 104).

[2] The complaint alleges that Bruce essentially engineered the claims of at least two of the creditors.  According to Kerrissey, Bruce convinced one of Kerrissey's employees, Anya Turchek, to steal blank checks from his office.  (Am. Compl. ¶ 56).  Bruce then used the checks to pay outstanding invoices to creditors Morin-Cameron Group and Hayes Engineering, Inc.  (*Id.*).  Bruce allegedly knew that there were insufficient funds in the account.  (*Id.* ¶ 57).  When the checks bounced, he solicited those creditors to join the involuntary bankruptcy.  (*Id.* ¶ 59).  However, Kerrissey has not submitted sufficient evidence to support that theory.

Following evidentiary hearings in August 2018, the Bankruptcy Court allowed the involuntary-bankruptcy petition against JKLLC. (*Id.* Ex. CC, at 201). However, the court dismissed the petition against Kerrissey individually, as petitioners had not established that "Kerrissey individually is not generally paying his debts." (*Id.*).

The Bankruptcy Court then appointed a trustee to administer the JKLLC bankruptcy estate. In June 2019, JKLLC agreed to a settlement that subordinated its $850,000 mortgage on the Blueberry Hills property to allow the project to be completed in exchange for a $100,000 cash payment to the bankruptcy estate. (*Id.* Ex. II). In February 2022, Forest Street Realty, through Bruce, purchased the note and mortgage from the bankruptcy estate for $15,000. (*Id.* Ex. MM).

After the involuntary-bankruptcy petition against Kerrissey was dismissed, Carger Trust brought a claim in the Massachusetts Superior Court. (*Id.* Ex. TT). In June 2019, the Superior Court granted summary judgment in favor of Carger Trust and assigned Kerrissey's ownership interest in Sagamore Place LLC to Carger Trust. (*Id.* Ex. SS).

B.    **Procedural History**

On December 26, 2019, Kerrissey and JDHE Holding, LLC filed the initial complaint in Massachusetts Superior Court. (Notice of Removal Ex. 1, Dkt. No. 1-3). The amended complaint was filed on July 19, 2021. (Am. Compl.). That complaint named William Bruce, David Deloury, James Mitchell, and Gary Cruickshank as defendants. (*Id.*). The case was thereafter removed to this court.

Defendant Bruce filed a counterclaim. (Dkt. No. 6). Defendants Mitchell and Cruickshank filed motions to dismiss, which the Court granted. (Dkt. Nos. 18, 19, 32). Plaintiff JDHE Holding, LLC and defendants Bruce and Deloury then stipulated to the dismissal of all claims by and between them with prejudice. (Dkt. No. 55). Plaintiff (and counterclaim-

defendant) Kerrissey, defendant (and counterclaim-plaintiff) Bruce, and defendant Deloury are the remaining parties to this case.[3]

On May 24, 2024, the Court granted the motion by Kerrissey's attorney to withdraw. Kerrissey did not obtain new counsel and has since been proceeding *pro se*.  (Dkt. No. 53).

Bruce has moved for partial summary judgment on Counts 1-10 of the amended complaint.  Those claims assert abuse of process, fraud, intentional infliction of emotional distress, breach of the implied covenant of good faith and fair dealing, conversion, trespass to property, interference with contracts, accounting, indemnification, and specific enforcement for the grant of real property.  He has not, however, moved as to Count 11, repayment of personal loans.

Kerrissey has filed a combined motion for leave to file late, opposition to defendant Bruce's motion for summary judgment, motion to strike, cross-motion for partial summary judgment, and motion for Rule 11 sanctions.  (Dkt. No. 104).[4]

## II.    Plaintiff's Motion to Strike and Motion for Rule 11 Sanctions

To start, plaintiff disputes the authenticity of defendant's Exhibits F, G, and N.  Exhibit F is the site-work contract between Forest Street Realty (owned by defendant) and JKLLC (owned by plaintiff).  Exhibit G is Addendum A to the site-work contract.  Exhibit N is a termination of contract letter between Forest Street Realty and JKLLC.  Plaintiff has moved to strike those exhibits and for Rule 11 sanctions.

Plaintiff contends that defendant's Exhibits F and G are "altered versions of the actual

---

[3] Defendant Deloury has not moved for summary judgment, and it is unclear whether plaintiff Kerrissey intends to continue to assert any claims against him.

[4] In light of plaintiff's *pro se* status, the Court will consider his opposition timely.  It will not, however, consider his cross-motion for summary judgment, as the combined motion does not address why he is entitled to summary judgment.

documents." (Def.'s Opp'n 2, Dkt. No. 104). He has submitted as plaintiff's Exhibit A the "actual signed contracts" that were used in his deposition and submitted to the Bankruptcy Court. (*Id.* at 4). There are material differences between defendant's Exhibits F and G and plaintiff's Exhibit A. For example, defendant's Exhibit G has Article 3 to Addendum A crossed out. Plaintiff's Exhibit A has no markings on Article 3 to Addendum A. That provision, if it is part of the contract, grants JKLLC a 12% share of the net profits and plaintiff personally a 13% share of the net profits. Plaintiff also cites to deposition testimony and other evidence that he says corroborate the assertion that his Exhibit A was the version of the site-work contract and Addendum A used in the bankruptcy proceedings.

He also contends that Exhibit N "does not exist" and "was manufactured for the defendant's motion." (*Id.* at 3).

The Court cannot resolve these evidentiary issues on the record before it. For the purposes of summary judgment, there is a genuine dispute of material as to which version of the site-work contract and Addendum A controls. Accordingly, taking the facts in the light most favorable to the non-moving party, the Court will treat plaintiff's Exhibit A as authentic and will not consider Exhibit N for purposes of this motion. The request to strike defendant's exhibits and for Rule 11 sanctions will be denied without prejudice.

## III.    Summary Judgment Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most

flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation modified). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986) (citation modified). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

In addition, any document filed by a *pro se* party is "to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Nonetheless, even a pro se litigant must meet the specificity requirement of Federal Rule 56, at least when the litigant becomes aware that specific facts must be provided to defeat a motion for summary judgment." *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988).

## IV.    Summary Judgment Analysis

Defendant has moved for summary judgment on Counts 1 through 10. The Court will address each in turn.

### A.    Count 1: Abuse of Process

Count 1 alleges that defendant organized an involuntary-bankruptcy process "for the ulterior or illegitimate purpose of eliminating [plaintiff's] interest in the Sagamore Place project, avoiding his obligation and avoiding his obligation to pay JKLLC[,] and otherwise promoting his self-interest as the expense of plaintiff." (Am. Compl. ¶ 90).

To prevail on a claim for abuse of process, "the fact finder must find that process was used 'to accomplish some ulterior purpose for which it was not designed or intended, or which

9

was not the legitimate purpose of the particular process employed.'" *Millennium Equity Holdings, LLC v. Mahlowitz*, 456 Mass. 627, 636 (2010) (quoting *Quaranto v. Silverman*, 345 Mass. 423, 426 (1963)). The three elements "are [1] that 'process' was used, [2] for an ulterior or illegitimate purpose, [3] resulting in damage." *Id.*

First, "[t]he use of 'process' . . . 'means causing papers to be issued by a court to bring a party or property within its jurisdiction.'" *Yacubian v. United States*, 750 F.3d 100, 110 (1st Cir. 2014) (quoting *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 406 n.9 (2000)). One can "use process" without being directly "involved in an activity which would fall within the definition of 'process.'" *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 408 (2002) (finding that police officers' falsified arrest reports "caused" the court to issue a criminal complaint); *see Yacubian*, 750 F.3d at 110 ("One can 'use process' under Massachusetts law by providing information that causes process to be used improperly." (citing *Gutierrez*, 437 Mass. at 408)).

Defendant was not a petitioner in the involuntary-bankruptcy proceedings. Nonetheless, he solicited the petitioners and paid their legal fees. It further appears that he served as an intermediary between the petitioners and the attorneys representing petitioners in the bankruptcy proceeding, and that at least one petitioner signed the petition at the request of defendant without speaking to counsel or anybody else. (Def's Opp'n 25; Def.'s Opp'n Ex. G, at 45-46). Defendant exercised an unusual degree of control over the bankruptcy proceedings to which he was not a party. Taking the facts in the light most favorable to plaintiff, petitioners would not have pursued involuntary bankruptcy but for defendant's involvement. Therefore, defendant did "use process" by directing or managing the filing of the involuntary-bankruptcy petition.

Second, the "ulterior motive" for an abuse of process claim is not an "improper motive of vexation, harassment, or annoyance." *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 713 (2011).

10

Rather, it is a "form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money." *Id.* at 714 (quoting *Vittands*, 49 Mass. App. Ct. at 406). Furthermore, the merits of the bankruptcy petitions are not dispositive to whether defendant used the proceeding for an improper purpose. *See Vittands*, 49 Mass. App. Ct. at 407 ("We note in this regard that even process that is obtained with probable cause and for a proper purpose does not necessarily preclude liability.").

The fact that defendant apparently organized and paid others to initiate a bankruptcy proceeding to which he was not a party raises the question of his purpose. Plaintiff alleges that he intended to achieve two collateral benefits: avoiding his obligation to pay JKLLC and eliminating plaintiff's interest in the Sagamore Place project. It is not clear how the involuntary bankruptcy would enable defendant to avoid his obligations. To be sure, prior to the petition, plaintiff, through JKLLC, retained an attorney and threatened legal process against defendant if he did not pay his debts. But the bankruptcy did not impede JKLLC from continuing to pursue repayment. Rather, bankruptcy provided a vehicle with which to do it. *See* 11 U.S.C. § 704(a)(1) ("The trustee shall . . . collect and reduce to money the property of the estate for which such trustee serves.").[5] As the bankruptcy judge explained, "anybody who knows anything about bankruptcy knows that by forcing the LLC into bankruptcy Mr. Bruce is really going from the frying pan into the fire." (Pl.'s Mot. Summ. J. Ex. CC, at 199).

Plaintiff's second theory, however, has more support. Taking the facts in the light most favorable to plaintiff and indulging all reasonable inferences in his favor, in the spring of 2018 defendant wanted out of his businesses with plaintiff. However, plaintiff had provided

---

[5] The Court does not reach defendant's claim that this theory is barred by collateral estoppel and *res judicata*. (Pl.'s Mem. Supp. Summ. J. 21-22, Dkt. No. 97).

significant personal contributions to their ventures, including the Sagamore Place project, and was seeking "a fair true up accounting of the relevant contractor/ownership relationships." (*Id.* Ex. O). Defendant realized that the traditional mechanisms for resolving LLC and partnership disputes would be disfavorable to him.[6] Instead, he solicited plaintiff's creditors to file an involuntary bankruptcy. He believed that plaintiff's share in the Sagamore Place LLC would be used to satisfy his personal debts to third-party creditors, thus forcing plaintiff out of the venture and enabling defendant to end it on more favorable terms to himself. Defendant told potential petitioners that filing the involuntary-bankruptcy petition and forcing plaintiff out of the partnership would enable defendant to make good on the debts.[7] He also paid at least one

---

[6] At his deposition, defendant testified that he had considered bringing a lawsuit against plaintiff. (Pl.'s Mot. Summ. J. Ex. X ("I started, you know, looking at and realizing that he didn't have the money he said and didn't have the equipment and all the problems that I was having, I was looking at suing Joe, but realized that that's exactly what he had other people do.")).

[7] At their depositions, petitioners Scott Cameron for Morin-Cameron and Peter Ogren for Hayes Engineering testified that defendant conveyed to them that their participation in the involuntary bankruptcy would enable him to break up that partnership, and that doing so would allow defendant to pay them.

> Q: So Mr. Bruce told you if you participate in this involuntary bankruptcy, it will aid him in removing Mr. Kerrissey from the project?
>
> A: Yes.
>
> Q: And that, in turn, would free up money for you to be paid on the project?
>
> A: Yes.

(Def.'s Opp'n 21 (deposition of Peter Ogren)).

> Q: Did Mr. Bruce tell you that by filing an involuntary bankruptcy it would in some way free him up to make payments on this account?
>
> A: Yes. He indicated that.
>
> Q: Can you describe in a little bit more detail how that conversation went?
>
> A: Basically he was trying to break the partnership, that he didn't want to be in the partnership anymore and this was a way to do that.

(Def.'s Opp'n Ex. G, at 44-45 (deposition of Scott Cameron)).

12

petitioner shortly after he signed the petition, which supports an inference that defendant paid him, at least in part, for joining the petition.  (Def.'s Opp'n Ex. G, at 41-42).

An involuntary-bankruptcy petition benefits creditors by providing an orderly mechanism for distributing a debtor's assets when the debtor is not paying debts as they come due.  *See* 11 U.S.C. § 303.  It is not a tool for resolving ownership disputes between members of a LLC, however contentious or justified.  Here, defendant did not back the involuntary petition to collect any debt owed to him (there was none).  He allegedly did so to try to force plaintiff to surrender his membership interest in the LLC and free defendant from an undesirable partnership.  That purpose is wholly unrelated to the legitimate function of involuntary bankruptcy and is instead directed at achieving a result that Massachusetts law provides separate mechanisms to pursue, such as judicial dissolution under Mass. Gen. Laws ch. 156C § 44 or buyout actions.

In sum, there is a genuine dispute of material fact as to defendant's purpose in pursuing the involuntary petition, and whether any ulterior motive was a proper use of the bankruptcy proceedings.

Third, "[d]amage is an essential element of the tort of abuse of process."  *Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756, 764 (1989).  Ultimately, the Bankruptcy Court dismissed the involuntary-bankruptcy petition against plaintiff individually.  (Pl.'s Mot. Summ. J. Ex. CC, at 202).  Plaintiff alleges that defendant then reached out to Carger Trust to "suggest[] that Carger's judgment be satisfied by reaching and applying [plaintiff's] interest in Sagamore Place."  (Am. Com. ¶ 89).  Indeed, Carger Trust secured a judgment in Massachusetts Superior Cout assigning plaintiff's interest in Sagamore Place to it.  (*Id.* Ex. SS).  Setting aside the lack of evidence that defendant in any way orchestrated that judgment, it occurred in an action that was separate from

13

the involuntary-bankruptcy proceeding. Therefore, for plaintiff's abuse of process claim, he is not entitled to damages from his loss of interest in Sagamore Place.

Plaintiff also seeks compensatory damages for the income he would have received from JKLLC were it not for the involuntary-bankruptcy proceeding. (*Id.* Ex. NN). However, he has not established how the bankruptcy proceeding against JKLLC was used for an improper ulterior purpose, nor why he was entitled to receive income from JKLLC given its financial position.

Finally, plaintiff also seeks attorney's fees incurred in the involuntary-bankruptcy action. Plaintiff's costs incurred from defending against an improper action are recoverable as compensatory damages. *Millennium Equity Holdings*, 456 Mass. at 645. Defendant maintains that plaintiff's claim to attorney's fees must fail, as he has only provided discovery on costs incurred in the joint representation of JKLCC and himself individually in the bankruptcy proceeding. However, that leaves a genuine issue of material fact as to what fees were incurred in defending the involuntary petition against plaintiff individually. Plaintiff therefore may be able to establish damages at trial for costs incurred, and accordingly, defendant is not entitled to summary judgment as to Count 1.

**B.** **Count 2: Fraud**

Count 2 alleges a "deliberate strategy of misrepresentation and deceit executed over a period of months . . . [to] defraud[] [plaintiff] of his interest in the Sagamore Place development and his equity interest in JKLCC" as exemplified by 23 allegations. (Am. Compl. ¶¶ 96-97).[8]

---

[8] Those allegations are: (1) "The control which Kerrissey would be allowed to exercise as manager of Forrest Street Realty"; (2) "The promise to place $100,000 in escrow against which billings at Blueberry Hill would be paid"; (3) "The promised grant of rights in the Bellingham property"; (4) "Falsely inducing Kerrissey's execution of the Blueberry Homes guaranty"; (5) "The promise that Kerrissey would be an equal partner in the Sagamore Place development"; (6) "The promise that personal loans would be timely repaid without any intention of ever doing so"; (7) "The sharing of false information with Kerrissey's employees and the Office of the Massachusetts Attorney General"; (8) "The theft and destruction of confidential records"; (9) "Solicitation of Kerrissey's employees to work against his interest"; (10) "Assurance that he had satisfied the Carger Trust judgment"; (11) "Intentional delay in sharing documentation to be executed in connection with the Sagamore Place development";

To prove a claim for fraud, plaintiff "must establish that the defendant[] made a false representation of material fact, with knowledge of its falsity, for the purpose of inducing the plaintiffs to act on this representation, that the plaintiffs reasonably relied on the representation as true, and that they acted upon it to their damage." *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 471 (2009).

There is a paucity of evidence supporting most of plaintiff's fraud claims. Moreover, for all of the allegations, plaintiff has not specified, either in the complaint or in his opposition to summary judgment, "the who, what, where, and when of the allegedly false or fraudulent representation." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004) (explaining the heightened pleading standard for fraud set out in Rule 9(b) to survive a motion to dismiss). The allegations concerning falsified documents that plaintiff describes in his opposition are not alleged in the complaint. Accordingly, the Court will grant summary judgment as to the fraud claims.

### C.    Count 3:  Intentional Infliction of Emotional Distress

Count 3 alleges that defendant's orchestration of the involuntary bankruptcy was "taken with deliberate malevolence and with the calculated desire to harm [plaintiff] for his own sport and self-interest." (Am. Compl. ¶ 101). Under Massachusetts law, a claim for intentional infliction of emotional distress requires proof

---

(12) "That title to the Sagamore Place property would be taken in an entity owned jointly by Bruce and Kerrissey"; (13) "The promise of a second mortgage against the Sagamore Place property securing Kerrissey's advances"; (14) "Theft of Kerrissey's checks and ensuring that they were delivered with insufficient funds for payment"; (15) "Coordination with creditors to alter their billing records to suggest that JKLLC owed them money so that they could petition for its bankruptcy"; (16) "Solicitation of petitioners for the involuntary bankruptcies of JKLLC and Kerrissey, individually"; (17) "Paying the costs and expenses associated with the involuntary-bankruptcy petitions"; (18) "Interference with Agritech's payments to JKLLC"; (19) "Withholding requisition payments due JKLLC"; (20) "Making false statements to the Melrose Police Department to block Kerrissey's removal of JDHE's property from Blueberry Hill"; (21) "Making a fraudulent claim on behalf of Brookstone Development in JKLLC's bankruptcy"; (22) "Permitting the theft and abuse of JDHE's property"; and (23) "Coordinating with the Carger Trust and Deloury for the elimination of Kerrissey's interest in Sagamore Place." (Am. Compl. ¶ 97).

(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress.

*Sena v. Commonwealth*, 417 Mass. 250, 263-64 (1994). "Severe" emotional distress is the "kind of distress that no reasonable man could be expected to endure, as opposed to mere emotional responses including anger, sadness, anxiety, and distress, which, though blameworthy, are often not legally compensable." *Kennedy v. Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010) (citation modified). "Although medical or psychiatric evidence is not necessary to satisfy this standard, there must be some evidence by which a jury could reasonably infer that the plaintiff suffered severe distress." *Rosencranz v. Freeman*, 2017 WL 1217112, at *13 (D. Mass. Mar. 31, 2017) (citing *Poy v. Boutselis*, 352 F.3d 479, 485-86 (1st Cir. 2003)).

Here, plaintiff has presented no facts showing that he suffered emotional distress, much less distress "that no reasonable man could be expected to endure." *Kennedy*, 617 F.3d at 530. There is no evidence of psychiatric reports, medical care, or physical symptoms. Nor could a jury infer severe emotional distress based upon plaintiff's alleged "fear for the continued financial well-being of his family," a common condition that many endure. (Am. Compl. ¶ 102). The Court will therefore grant summary judgment as to Count 3.

### D.    Count 4:  Breach of the Implied Covenant of Good Faith and Fair Dealing

Count 4 alleges that defendant breached the implied covenant of good faith and fair dealing "[t]hrough each of his promises to and agreements with Kerrissey, written and oral." (Am. Compl. ¶ 103).

The covenant of good faith and fair dealing, which is implied in every contract, "provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Weiler v. PortfolioScope, Inc.*, 469 Mass.

16

75, 82 (2014) (citation modified). "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims . . . ." *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D. Mass. 2005). A complaint need not allege a breach of an express term of the contract. *See Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). Rather, it must allege that defendant acted in "bad faith or [with] an absence of good faith," *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013), to "unfairly leverag[e] the contract terms for undue economic advantage," *Blake v. Professional Coin Grading Serv.*, 898 F. Supp. 2d 365, 389 (D. Mass. 2012). The requirement of good-faith performance is, however, circumscribed by the obligations set forth in the contract, and "the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *Speakman*, 367 F. Supp 2d at 132.

There are at least three agreements between plaintiff and defendant specifically alleged in the complaint: Addendum A to the Blueberry Hill site-work contact; the Sagamore Place LLC operating agreement; and defendant's agreement to pay $15,000 owed to plaintiff directly to Carger Trust.

As to Addendum A, defendant asserts he is entitled to summary judgment because "the terms . . . are clear and unambiguous, and . . . there are no other writings that reflect the terms of the parties' agreement." (Pl.'s Mem. Supp. Summ. J. 30, Dkt. No. 97). However, the covenant of good faith and fair dealing is not limited to the express terms of the contract. It seeks to ensure that neither party does anything to destroy or injure the right of the other party to receive the fruits of the contract. Furthermore, defendant does not explain how the Carger Trust agreement is either not a contract or cannot support a claim for breach of the implied covenant.

17

Because defendant has not carried his burden of coming forward with proof that there is no genuine dispute of material fact, the Court will deny summary judgment as to Count 4.

E.   **Count 5, 6, and 7:  Conversion, Trespass to Property, and Interference with Contracts**

Count 5 and 6 allege that defendants blocked plaintiff's efforts to remove JDHE's equipment from the Blueberry Hill property and that as a result "JDHE suffered damages."  (Am. Comp. ¶¶ 110, 113).  Count 7 alleges that defendant interfered with JDHE's rental agreements and that as a result "JDHE was damaged."  (*Id.* ¶ 118).

JDHE is no longer a party to this case.  On June 4, 2024, the parties stipulated that all claims between defendants and JDHE be dismissed with prejudice.  (Dkt. No. 55).  Plaintiff does not have standing to assert claims on behalf of JDHE.  *See Pagán v. Calderon*, 448 F.3d 16, 28 (1st Cir. 2006) ("[A]ctions to enforce corporate rights or redress injuries to a corporation cannot be maintained by a stockholder in his own name even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock.  The tenet holds true even if the shareholder is the sole owner of the corporation's stock." (citation modified)).  The Court will therefore grant summary judgment as to Counts 5 through 7.

F.   **Count 8:  Accounting**

Count 8 seeks an accounting, alleging that plaintiff "regularly advanced considerable sums on behalf of their partnership interests with the understanding that those amounts would be offset against any amounts paid by [defendant]."  (Am. Compl. ¶ 120).  He maintains that defendant owes "the balance of advances made on behalf of their partnership interests shown necessary to balance their contributions."  (*Id.* ¶ 121).

Defendant contends that plaintiff cannot assert an equitable action for accounting.  (Pl.'s Mem. Supp. Summ. J. 31-32 (citing *Kaufman v. Buckley*, 285 Mass. 83, 85 (1933)).  The

language of the claim, however, seems to be a statutory action for accounting under

Massachusetts Uniform Partnership Act.  Under Massachusetts law, a partnership is "an

association of two or more persons to carry on as co-owners a business for profit," other than

"any association formed under any other statute."  Mass. Gen. Laws ch. 108A, § 6.  Upon the

dissolution of a partnership, each partner "has the right to wind up the partnership affairs."  *Id.*

§ 37.  That right includes "the right to an account of his interest" in the partnership.  *Id.* § 43.

Defendant contends that summary judgment should be granted because plaintiff and

defendant's venture on the Sagamore Place project is governed by the Sagamore Place LLC

Operating Agreement.  That agreement, however, does not encompass the full scope of the

relevant conduct.  Defendant has not established that he is entitled to judgment as a matter of law

that plaintiff and defendant did not form a partnership on the Blueberry Hill project.  Although

there was no formal partnership agreement, that does not resolve the question of whether a

partnership existed.  *See Kansallis Fin. Ltd. v. Fern*, 40 F.3d 476, 479 (1st Cir. 1994) ("While a

partnership undoubtedly requires an agreement among the partners, that agreement need not be

in writing.  Rather, intent to carry on business as partners may be inferred from the partners'

words and acts."); *Southex Exhibitions, Inc. v. Rhode Island Builders Ass'n.*, 279 F.3d 94, 102

(1st Cir. 2002) ("[T]he labels the parties assign to their intended legal relationship, while

probative of partnership formation, are not necessarily dispositive as a matter of law.").  Because

defendant has not addressed whether plaintiff is entitled to a partnership accounting, the Court

will deny summary judgment as to Count 8.

### G.     Count 9:  Indemnification

The complaint alleges that in November 2017 defendant owed "Carger Trust $15,000

under an advantageous agreement for satisfaction of a $250,000 judgment at a significant

discount conditioned upon timely payment."  (Am. Compl. ¶ 32).  It asserts that defendant

promised plaintiff "that he would satisfy the Carger Trust judgment and assured [plaintiff] that he had done so." (*Id.* ¶ 122). Nonetheless, defendant "purposely failed to pay the Trust the $15,000 and, accordingly, the judgment remained outstanding for the full amount with continuing interest." (*Id.* ¶ 33). Count 9 contends that plaintiff is therefore entitled to indemnification against liability from the Carger Trust judgment.

There is evidence to support the allegation that in November 2017 defendant told plaintiff that he had paid Carger Trust the outstanding $15,000. A November 2017 text exchange shows that plaintiff reached out to defendant seeking immediate repayment of a loan. (Pl.'s Mot. Summ. J. Ex. QQ). Plaintiff explained that he "made a deal with a company named Carhart [sic] trust which I have dealing with for a while. . . . I have already paid 5k out of 20k and have to pay the remaining 15K immediately." (*Id.*). Defendant responded: "I have wanted to pay you back faster and had planned to it just haven't happened as I thought. i understand the importance of this and if you send me cargar trusts information then I will wire the 15k direct to them for you and let you know it was sent." (*Id.*). Plaintiff then sent the requested information. Several days later, defendant texted plaintiff: "Joe I have reached Charles Kelly for cargar and sent him the check. he said he would rather a check than wire as you wanted to send. he said once he receives the check he will contact ryan to finalize the dismissal." (*Id.*).

That evidence does not support a claim for indemnification. Under Massachusetts law, "[a] right to indemnification may arise . . . (1) where there is an express contract for indemnification; (2) where a contractual right to indemnification is implied from the relationship between the parties; and (3) under common law, where a party is exposed to liability because of the negligent act of another." *Yanis v. Paquin*, 96 Mass. App. Ct. 134, 140 (2019).

Here, there is no express indemnification agreement for the total $250,000 judgment.

20

Rather, defendant agreed to pay the $15,000 he owed plaintiff directly to Carger Trust. Nor is there an implied agreement to do so. "[F]or a relationship to generate an obligation to indemnify, the relationship must be 'generally recognized' as special." *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 43 (1st Cir. 2017) (quoting *Fireside Motors, Inc. v. Nissan Motor Corp.*, 395 Mass. 366, 375 (1985)). Plaintiff and defendant's relevant relationship as lender-borrower is not one such generally recognized special relationship. Nor does common-law tort indemnification apply. Plaintiff's $250,000 obligation to Carger Trust preexisted his agreement with defendant. His liability did not arise because he was "compelled by operation of law to defend . . . against the wrongful act of another." *Elias v. Unisys Corp.*, 410 Mass. 479, 482 (1991).

There are other issues with a claim that defendant is liable for the full Carger judgment. There is no evidence in the record of any agreement between plaintiff and Carger Trust to settle a $250,000 judgment for $15,000. Even if there were, the text exchange does not suggest that defendant knew that relief from a larger judgment was contingent upon the timely payment of $15,000. *See Simon v. Solomon*, 385 Mass. 91, 112 (1982) ("'Consequential damages' cover all losses that are *reasonably foreseeable* to the actor . . . " (emphasis added)). Regardless, indemnification does not apply and the Court will grant summary judgment as to Count 9.[9]

### H.   Count 10:  Specific Enforcement for Grant of Bellingham Property

Count 10 seeks to enforce defendant's "promise[] to grant [plaintiff] the 18 acres of industrial zoned land, or rights to its development, on Old Farm Road in Bellingham, Massachusetts in consideration for JKLLC's forbearance and extension of credit for amounts do [sic] for work at Blueberry Hill." (Am Compl. ¶ 125).

Defendant contends that any such agreement is unenforceable under the statute of frauds.

---

[9] The Court does not reach defendant's contention that this count is barred by *res judicata*.

To be enforceable, agreements involving any interest in land must be in writing and signed by the party to be charged. Mass. Gen. Laws ch. 259, § 1. Such writing set forth "with reasonable certainty" "all of the essential terms of the parties' agreement." *Shea v. Millett*, 36 F.4th 1, 7 (1st Cir. 2022) (quoting *Simon v. Simon*, 35 Mass. App. Ct. 705, 709 (1994)). A contract for the sale of land "must contain a description of the land sold that applies to one parcel of land only." *Michelson v. Sherman*, 310 Mass. 774, 778 (1942).

In his response to defendant's interrogatories, plaintiff identified a single writing to support his claim to 18 acres of land in Bellingham. (Pl.'s Mot. Summ. J. Ex. NN). He has not identified any other relevant writings in his response to defendant's motion for summary judgment. That writing is an email exchange between plaintiff and defendant from June 2019. (*Id.* Ex. OOA). In that exchange, plaintiff stated: "You had made me a deal with me to give me ownership of the buildable land you were not using for the storage facility in bellingham . . . " (*Id.*). Defendant then replied: "For the record I am confirming that we are splitting the ownership of the unused land after self storage and signs for an ABC plant or dealership or what ever we are [sic] decide is the best use and am qualifying this as an agreement with a contract to follow . . . . " There is no follow-on contract in the record.

The email exchange runs into several statute of frauds problems. First, it is not signed by either party. Second, it does adequately describe the interest in land. Is "splitting the ownership" a joint tenancy or division of the land? How much of the land is reserved for self-storage and the ABC plant or dealership? Third, the agreement is explicitly qualified and contemplates further negotiations. *See Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 599 (1987) ("Particularly in the context of a complex commercial transaction, we have had occasion to caution against the transformation of general expressions of intent, when significant

details remain to be resolved, into legally binding agreements.")  Accordingly, any agreement involving the Bellingham land is not enforceable under the statute of frauds, and summary judgment will be granted as to Count 10.

**V.      Conclusion**

For the foregoing reasons:

1.      Defendant's motion for summary judgment is GRANTED as to Counts 2, 3, 5, 6, 7, 9, and 10, and otherwise DENIED; and

2.      Plaintiff's motion to strike and for sanctions is DENIED without prejudice, and for summary judgment is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 31, 2026                            United States District Judge

23